UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

HARBANS KAUR,

                                        Plaintiff,

             -against-

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION (A.K.A. HARLEM HOSPITAL),

                                   Defendants.

------------------------------------------------------------------- x

**DEFENDANT'S
STATEMENT OF
UNDISPUTED
MATERIAL FACTS
PURSUANT TO
LOCAL CIVIL
RULE 56.1**

07 Civ. 6175
(LAP)(MHD)

        Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, defendants the New York City Health and Hospitals Corporation, ("HHC"),[1] submit this Statement of Undisputed Material Facts as to which there are no genuine issues to be tried:

        1.      Plaintiff Harbans Kaur ("plaintiff"), a former Nurse employed by HHC at Harlem Hospital Center, brings this action pursuant to Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law §296, the New York City Administrative Code § 8-502(a), et. Seq., and New York State Executive Law § 296, et seq., Human Rights Law, N.Y.C. Administrative Code § 8-101 et seq., alleging employment discrimination and wrongful termination based on based upon national origin and retaliation for asserting her rights under

---

[1] Harlem Hospital Center is not a suable entity. See Ayala v. Bellvue Hosp., No. 94 Civ. 1551, 1999 U.S. Dist. LEXIS 12982, at *9 (Aug. 19, 1999). Inasmuch as Harlem Hospital Center is not a City agency, and it has not been authorized as a suable entity by law, plaintiff's claims against it are improper and must be dismissed.

anti-discrimination laws.  <u>See</u> Exhibit "A."[2]  Specifically, plaintiff alleges that defendants subjected her to offensive statements about her national origin, false accusations of work misconduct, terminated her for discriminatory purposes, subjected her to a hostile work environment and retaliated against her for asserting her rights under anti-discrimination laws. <u>Id.</u> at ¶ 11

A.       **Background**

2.       Plaintiff is a female of Asian-Indian national origin.   <u>See</u> Exhibit "A" at ¶ 12.

3.       Plaintiff began her employment with HHC on December 21, 1987 as a Licensed Practical Nurse at Harlem Hospital. <u>See</u> Exhibit "A at ¶ 9;" <u>see also</u> Exhibit "B" at 7: 12-14.  On March 6, 1989, plaintiff was transferred to Elmhurst Hospital and on December 9, 1991, plaintiff became a Staff Nurse.   <u>See</u> Exhibit "C;"  <u>see also</u> Exhibit "B" at 12: 1-3. Plaintiff testified that she voluntarily transferred to Elmhurst Hospital due to "family problems" and because Harlem Hospital was "far from home." <u>See</u> Exhibit "B" at 12: 4-22.   Plaintiff returned to Harlem Hospital in 1992. <u>See</u> Exhibit "B" at 13: 21-25.

4.       Since 1996, June Bobcombe has been employed by Harlem Hospital. <u>See</u> Exhibit "D" 16: at 9-15.  Currently and for approximately ten years, she has held the position of Clinical Director of Nursing.   <u>See</u> Exhibit "D" 16: at 16-20. Prior to that, and for approximately ten years, Ms. Bobcombe was the Associate Director of Nursing and prior to that, she held the position of the Assistant Director of Nursing. <u>See</u> Exhibit "D" 16: at 21-25; 17: at 1-8. Ms. Bobcome holds a Bachelor's and Master's degree and is a licensed Registered Nurse. <u>See</u> Exhibit "D" 17: at 1-25.  In her present capacity as the Clinical Director of Nursing, Ms.

---

[2] Unless otherwise indicated, all exhibits and declarations cited to herein refer to those exhibits and declarations annexed to the Declaration of Camille D. Barnett, dated August 27, 2009, and

Bobcombe supervises approximately 80 employees.  See Exhibit "D" 20: at 1-5.  For at least ten years, Ms. Bobcombe was a second level supervisor of plaintiff.  See Exhibit "D" 20: at 919-25; 21: at 1-15.

5.  Director Bobcombe testified that Harlem Hospital utilizes what is called progressive discipline, meaning that if an employee has performance problems or has engaged in misconduct, an employee is spoken to, then counseled, warned and then if improvement is not made, the employee is referred to human resources/labor relations for disciplinary charges.  See Exhibit "D" 25: at 17-25; 26: at 1-6; 29: at 6-8.  Director Bobcombe does not terminate or recommend the termination of employees.  See Exhibit "D" 26: at 4-25; 27: at 1-16; 28: at 4-8, 25; 29: at 1-10 .

6.  Director Bobcombe could not recall any complaints of discrimination filed against her.  See Exhibit "D" 19: at 21-23.

7.  Edythe Stoddard has been employed by Harlem Hospital Center for approximately thirty-two years and since December of 2007, has held the position of Supervisor of Nurses.  Prior to the Supervisor of Nurses position,  Supervisor Stoddard held the position of Head Nurse for over ten years.  See Exhibit "E" 10: at 21-25; 11: at 1-15.  Supervisor Stoddard is a licensed Registered Nurse and has a Bachelors of Science in Nursing  and Master's of Science degree.  See Exhibit "E" 14: 17-25; 15: at 1-3; 15: at 22-25; 16: at 1-2.  Supervisor Stoddard supervises approximately twenty—five nurses.  See Exhibit "E" 20: at 9-15.

8.  Supervisor Stoddard does not terminate or recommend the termination of employees as terminations are handled by labor relations.  See Exhibit "E" 17: at 11-22.  Supervisor Stoddard testified that in situations of poor performance or misconduct, head nurses

submitted herewith.

counsel employees and apprise the employee of the problem or issue, which is done with in the presence of union representation. See Exhibit "E" 18: at 5-18.

9. Supervisor Stoddard last supervised plaintiff in 1998 for approximately one year. See Exhibit "E" 21: at 7-8; 30: at 17-25; 31: at 1-3. Ms. Stoddard testified that Harlem Hospital Center utilizes a progressive discipline procedure where an employee is informally counseled, then formally counseled. See Exhibit "E" 30: at 9-12. If the behavior does not change, the employee is given a warning and if there is still no improvement the employee is referred to labor relations. See Exhibit "E" 30: at 9-16.

10. Supervisor Stoddard testified in her deposition that when she supervised plaintiff in 1998 as a Head Nurse, plaintiff's work performance was not up to standard and that plaintiff did not follow the criteria-based performance evaluations for the nursing staff and certain aspect of her performance was marginal. See Exhibit "E" 41: at 17-25; 42: at 1-12. In particular, Supervisor Stoddard testified that plaintiff's interpersonal skills and completions of assignments were marginal. See Exhibit "E" 42: at 13-16.

11. Ms. Stoddard has never had a complaint of discrimination made against her. See Exhibit "E" 20: at 24-25; 21: at 1-6.

12. Plaintiff alleges that on or about the Spring of 1998, a group of nurses of Caribbean descent began a pattern of discrimination against her. See Exhibit "A" at ¶ 11.

13. Plaintiff does not identify any similarly situated nurse who were treated differently. See Exhibit "A," generally.

**B.   Plaintiff Received Numerous Marginal And Unsatisfactory Performance Evaluations Throughout Her Employment With Harlem Hospital Center.**

14. In a Probationary Performance Evaluation, which covered the period of June 8, 1992 through September 8, 1992 and was prepared by Head Nurse M.L. Rivera, plaintiff

4

received an overall "Marginal" rating and also received "Marginal" ratings in several specific areas. See Exhibit "F." Marginal ratings, as described in the performance evaluations, mean that plaintiff's performance inconsistently demonstrates basic skills and knowledge for safe patient care delivery and nursing practice. See Exhibit "F."

   15. In particular, plaintiff received Marginal Ratings in the following areas: "Records nursing assessment on patient records;" "Initiates written nursing care plan upon admission of patient;" "Explains involves and instructs patient/family concerning therapeutic regimen;" "Collaborates with other health professionals in planning care for assigned patients;" "Functions effectively, both individually and as team member, during crisis and emergency situations;" "Cooperates with co-workers and supervisory staff;" "Demonstrates understanding of impending emergencies and initiated immediate action;" "Functions in calm manner during emergencies and crisis situations;" "Checks, as assigned, to insure that emergency equipment and supplies are available and in proper working condition;" "Conforms to established time and leave regulations;" "Observes hospital uniform codes and dress guidelines" "Wears identification/name badge at all times while on duty;" and "Conforms to policies governing patient abuse, patient rights and confidentiality of information. Id.

   16. In handwritten comments on the evaluation, it was noted that plaintiff "[h]as to be helped with documentation especially on critical and emergency cases," "[h]as had frequent arguments with patients and co-workers," and [h]as not demonstrated ability to function during emergencies." Id. In areas for improvement, it was noted that plaintiff "[n]eeds to develop skills as an ER nurse to be able to function during emergencies" and "[n]eeds to learn to relate to co-workers and develop rapport with patients and co-workers. Id.

17. In the commentary section of the performance evaluation, the following was noted:

> Ms. Kaur has not demonstrated the ability to function during emergencies; cannot function under stress. Needs to be able to relate and cooperate with co-workers. Has tendency to argue and fight with co-workers and also patients at time .... Id.

18. In an annual performance evaluation which covered the period June 1992 through June 1993, as prepared by Head Nurse M.L. Rivera, plaintiff again received a "Marginal" rating. See Exhibit "G." In particular, plaintiff received a "Marginal" rating in the following three areas: "Completes patient care and other assignments within a reasonable time frame;" "Functions effectively, both individually and as a team member, during crisis and emergency situations;" and "Cooperates with co-workers and supervisory staff." Notably, plaintiff received "Unsatisfactory" ratings, which is described as "Unsatisfactory performance which does not meet normal requirements of position," in several areas, including "Arrives and leaves patient area at designated times;" and "Provides proper notification for absences and tardiness." Id.

19. In handwritten notes on the evaluation, it was written that plaintiff "complains about assignments at times," "has numerous arguments with co-workers and patients," and "arrives to work late without notification for lateness." Plaintiff was noted as needing improvement with punctuality and interpersonal relationships with co-workers and patients. It was also noted that plaintiff "has poor working relationships with co-workers and gets into arguments with staff." Id.

20. In an annual performance evaluation which covered the period June 1993 through June 1994, plaintiff received an overall rating of "Marginal." See Exhibit "H." Plaintiff received Marginal ratings in the following twenty-two specific items: "Observes

6

symptoms or changes in patient status and responds promptly, exercising reasonable judgment;" "Plans nursing care for patient, based on identified problems/needs;" Identifies goals and expected outcomes;" "Develops nursing approached for patient care;" "Develops discharge plans with the physician, the patient's family and other available resources;" "Establishes treatment priorities based on medical and nursing diagnosis;" "Implements and records patient/family teaching;" "Completes patient care and other assignments within reasonable time frame;" Evaluates nursing care plan on an on-going basis and makes modifications, as indicated;" " Records discharge summary of nursing intervention, teaching and care plans;" "Explains, involves and instructs patient/family concerning therapeutic regimen;" "Collaborates with other health professionals in planning care for assigned patients;"  "Functions effectively, both individually and as team member, during crisis and emergency situations;" "Cooperates with co-workers and supervisory staff;"  "Investigates and intervenes in problems/situations, reporting appropriate information to supervisor, physician, etc., in a timely manner;" "Coordinates unit routines and provides guidance and supervision to assigned unit nursing staff;" "Follows communication channels according to organization charts;" "Demonstrates understanding of impending emergencies and initiates immediate action;" "Functions in calm manner during emergencies and crisis situations;" "Attends nursing related educational programs within institution, as well as well as those offered by outside agencies, and shares information;" " Arrives and leaves patient area at designated times;" and "Provides proper notification for absences and tardiness." Id.

21. In handwritten comments on the evaluation, it was noted that plaintiff "constantly complains and argues with co-workers and patients."  With respect to areas that needed improvement, the evaluation stated that plaintiff needed to improve tardiness,

interpersonal relationships with staff and patients, and remaining in area of assignment as well as completing the assignment given . Id.

22. In an annual performance evaluation covering the period of June 8, 1994 through June 8, 1995, prepared by Head Nurse M.L. Rivera, plaintiff received an overall rating of "Marginal."   See Exhibit "I."   Plaintiff received marginal ratings in various specific performance areas such as "Functions effectively, both individually and as team member, during crisis and emergency situations," "Cooperates with co-workers and supervisory staff," "Conforms to established tine and leave regulations," "Arrives and leaves patient area at designated times," "provides proper notification for absences and tardiness," "Establishes treatment priorities base don medical and nursing diagnosis." The evaluation noted that plaintiff needed "to work as part of team" and had "arguments with co-workers in front of patients" and "reports to areas of assignment late and leaves before time."   Under areas for improvement, it was also noted that plaintiff "needs to report to assigned area on time and stay in assigned area" and "needs to improve in interpersonal relationship with staff and patients."   Under plans for improvement, it was noted that plaintiff was granted a change of time schedule to accommodate her needs and that plaintiff will be monitored for compliance.  Under the comments section, it states that plaintiff "let's her interpersonal relationship with staff interfere with her ability to render patient care appropriately" and that plaintiff "still needs to be able to work as part of a team." Id.

23. In an annual performance evaluation for the period of June 12, 1995 through June 12, 1996, prepared by Head Nurse, M.L. Rivera, plaintiff was given an overall rating of "Satisfactory."   See Exhibit "J."  In handwritten notes it was explained that plaintiff's "interpersonal relationship with some of her co-workers interferes with her work."

24. In an annual performance evaluation for the period of June 1997 through June 1998, prepared by M.L. Rivera, plaintiff was given an overall rating of "Marginal." See Exhibit "K." Plaintiff received marginal ratings in the following areas: "Develops a therapeutic and supportive relationship with the patients/family;" "Utilizes constructive solutions to problems;" "Promotes nursing staff compliance with policies and procedures;" "Demonstrates positive verbal and non-verbal communication skills;" "Reports on time and ready to work at start of the shift;" "Returns promptly from meals/breaks and errands;" and "Accepts reassignment to other units when necessary." The evaluation noted that plaintiff needed to improve on interpersonal relationships, punctuality and reporting to her assigned area in a timely manner and accepting her assignments without argument. The evaluation also noted that plaintiff lets interpersonal relationships interfere with her performance of duties at times, that plaintiff comes to work late and reports to assigned areas late and refuses assignment to "Peds ER." Id.

25. Plaintiff testified that she believed that Ms. Rivera gave her four "marginal" evaluations in a row because plaintiff was Indian and Ms. Rivera was Filipino. See Exhibit "B" 57: at 7-19.

26. In an annual performance evaluation covering the period June 8, 1998 through June 8, 1999, prepared by Head Nurse, Edythe Stoddard, plaintiff was given an overall rating of "Marginal." See Exhibit "L." Plaintiff received marginal ratings in various specific performance areas and received an Unsatisfactory rating in the area of "Demonstrates positive verbal and non-verbal communication skills." Unsatisfactory, as described in the performance evaluation means that plaintiff "does not meet normal requirements of position." Plaintiff needed improvement in interpersonal and communication skills, team concept and needed to develop a

positive rapport with peers and patients and understand working as a team member. Plaintiff was said to have "inappropriate behavior and aggressive type of communications." The evaluation stated that said behavior was directed toward co-workers, medical staff, Head Nurses and sometimes patients and their relatives. Id.

27. In an annual performance evaluation covering the period June 8, 1999 through June 8, 2000, prepared by Assistant Head Nurse, P. Cash-Smith plaintiff was given an overall rating of "Marginal." See Exhibit "M." Plaintiff received an unsatisfactory rating in the following nine performance areas: "Coordinates unit routines and provides guidance/supervision to assigned nursing staff;" "Leads by professional example;" "Develops a therapeutic and supportive relationship with the patients/family;" "Instructs and involves patient/family regarding therapeutic regimen;" "Utilizes constructive solutions to problems;" "Demonstrates positive verbal and non-verbal communication skills;" "Addresses patients/visitors in a professional manner;" "Functions as a patient advocate;" "Returns promptly from meals/breaks and errands;" and "Observes facility policies governing conduct at work such as no smoking and telephone usage."

28. Handwritten comments on the evaluation state that plaintiff "does not follow assignment," is "frequently argumentative, has "poor interpersonal skills with co-workers and patients," is frequently off unit and is "on phone throughout tour."    Under areas for improvement, plaintiff's interpersonal skills with staff and co-workers is noted along with plaintiff's attendance, which was not in compliance with HHC policy and procedures.

29. In an annual performance evaluation covering the period of December 8, 2001 through December 8, 2002, prepared by Associate Director Nadia Miller, plaintiff did not receive an overall rating. However, the performance evaluation noted that plaintiff's punctuality

needed to be improved and plaintiff was given an unsatisfactory for "Reports on time and ready to work at start of shift." See Exhibit "N." Also, it was noted that plaintiff needed to improve her interpersonal relationships and that plaintiff's punctuality would be monitored and assistance would be available to improve her punctuality but that corrective action taken be used if necessary. Id.

      30. In a performance evaluation covering the period of June 18, 2003 through September 17, 2003, prepared by Naomi Griffin, Director of Special Projects, plaintiff was given an overall rating of "Satisfactory." See Exhibit "O." This evaluation did however note that plaintiff "needs to begin to communicate with her peers in the dept. and collaborate with them on a constant basis." Id.

      31. In a performance evaluation for the period of September 18, 2003 through December 28, 2003, prepared by Naomi Griffin, Director of Special Projects, plaintiff was given an overall rating of "Satisfactory." See Exhibit "P." The evaluation noted that plaintiff needed to continue to work on her communication. Also, plaintiff was said to have a "reluctance to communicate and collaborate with her professional peers" and that this issue has been addressed with her.

      32. In a performance evaluation for the period covering December 28, 2003 through December 27, 2004, as prepared by June Bobcombe, the Clinical Director for Nursing, plaintiff was given an appraisal rating of "Satisfactory" but in areas for improvement, it was noted that plaintiff "must handle situations in a calm, objective manner." See Exhibit "Q."

      33. In a performance evaluation for the period covering December 27, 2004 through December 28, 2005, as prepared by Clara Fagbeyiro, a Nurse Manager, plaintiff was given an appraisal rating of "Marginal." See Exhibit "R." Plaintiff was given a marginal rating

in the following four performance areas: "Promotes nursing staff compliance with policies and procedures;" "Monitors, evaluates, assures compliance with quality improvement standards;" "Demonstrates positive verbal and non-verbal communication skills;" and "Accepts reassignments to other units when necessary." Plaintiff was given an unsatisfactory rating in the following three performance areas: "Reports on time to work at the start of the shift;" "Returns promptly from meals/breaks and errands;" and "Observes facility uniform/dress codes." It was specifically noted that plaintiff needed to report to work at 8:00 a.m. as opposed to 8:30 a.m. everyday.

34. In a three month follow-up performance evaluation for the period covering December 29, 2005 through March 28, 2006, prepared by Clara Fagbeyiro, a Nurse Manager, plaintiff was given an appraisal rating of " Marginal." See Exhibit "S." Plaintiff received an unsatisfactory rating in the following eleven performance areas: "Demonstrates ability to provide direction in changing work load, p[particularly during crisis/emergency situations;" "Supports philosophy, objectives and goals of nursing department;" "Demonstrates positive verbal and non-verbal communication skills;" "Addresses patient/visitors in a professional manner;" "Functions as a patient advocate;" "Attends and shares related educational programs;" "Participates in nursing or other patient care committees and/or projects within institution;" "Reports on time and ready for work at start of the shift;" "Returns promptly from meals/breaks and errands;" "Accepts reassignment to other units when necessary;" and "Observes facility uniform/dress code."

35. It was explicitly noted in the performance evaluation that plaintiff was "quarrelsome, screams at staff and patients, does not follow uniform code, comes late everyday and leaves area of work without telling anyone. Also, plaintiff was said to be verbally abusive,

uses profane language and screams at patients and staff.  In particular, handwritten comments on the evaluation state that plaintiff "comes to work late on a daily basis, returns late, refuses whenever sent to the other side to work and never wears the appropriate uniform."  In areas for improvement, it was noted that plaintiff "needs to report to work at 8:00 a.m. as scheduled and stop coming late everyday as she does and needs to sign the correct arrival time and wear the appropriate uniform."

36. In another three month follow-up performance evaluation for the period covering March 28, 2006 through June 27, 2006, prepared by Nurse Manager, Clara Fagbeyino, plaintiff was given an "Unsatisfactory" appraisal rating.  See Exhibit "T."  Again, plaintiff received unsatisfactory and marginal ratings in various performance areas.  It was again noted that plaintiff "quarrels with staff and patients, is rude and loud to everyone and does not involve herself with other staff members, either staying in the lounge or locking herself in an exam room reading the newspaper or on the phone."  The evaluation further stated that plaintiff reported to work late at least 20 minutes late everyday, returned thirty minutes late from lunch and left to go home between 4:10 p.m. and 4:15 p.m. and was always on the telephone.  Plaintiff wore any color uniform and shoes and never follows the dress code and did not listen to correction.  It was noted that plaintiff was suspended from April 7, 2006 through July 19, 2006. Id.

37. In another three month follow-up performance evaluation for the period covering June 28, 2006 though December 27, 2006, as prepared by Nurse Manager, Clara Fagbeyiro, plaintiff was given an "Unsatisfactory" appraisal rating.  See Exhibit "U."  Again, plaintiff received unsatisfactory and marginal ratings in various specific performance areas.  Plaintiff was said to quarrel with staff and patients, was rude and loud to everyone and does not involve herself with other staff members, either staying in the lounge or locking herself in an

exam room reading the newspaper or was on the telephone.   Plaintiff was described as verbally abusive, used profanity and screamed at patients and staff.   Plaintiff reported late to the unit at least 20 minutes everyday, returned thirty minutes late from lunch, went home between 4:10 pm and 4:15 pm and was always on the telephone.  The evaluation also noted that plaintiff never followed the uniform or dress code.  As a means of improvement, plaintiff was directed to report to the unit at 8 a.m. as per hospital policy, stop going back and forth to the lounge and leave the unit at 4:30 p.m. as scheduled.  Plaintiff was said to not like to do as much work as she used to and leaves most of the work for others.  Id.

## C.   Plaintiff Received Counseling Sessions, Warnings And Action Plans For Improvement of Her Work Performance Throughout Her Employment With Harlem Hospital Center.

38. In October 1993, plaintiff received an Action Plan for Improvement. See Exhibit "V."  The Action Plan for Improvement stated that plaintiff was not satisfactory in the areas of tardiness and poor interpersonal relationships.  Plaintiff was counseled regarding these issues and was to have her  work times checked for three months and was encouraged to takes classes to learn techniques in  interpersonal relationships.  Plaintiff was to be re-evaluated in three months.

39. On February 9, 1994, plaintiff was given a counseling session by Registered Nurse, Mr. R. Batten.  See Exhibit "W."  The counseling session discussed plaintiff's poor interpersonal relationships with her peers, professional staff and patients, her frequent departures from her area of assignment and her argumentative manner in the presence of patients and staff.  Plaintiff's conduct was to be monitored closely and reviewed for the next three months. Id.

40. In an internal memorandum reporting on the counseling session, plaintiff's "poor interpersonal relationships with her peers, professional staff and patients" was

discussed.  Additionally, it was noted in the memorandum that plaintiff "frequently leaves her area of assignment unattended thus affecting the productivity of work."  Also, plaintiff was described as "argumentative in the presence of patients and staff thus making her conduct unbecoming a professional."  Id.

41. Plaintiff was given a corrective action plan to which plaintiff, her Union and her supervisors agreed that required plaintiff to do the following: (a) start to improve her interpersonal relationships with her peers and staff by ignoring idle gossip she hears; (b) stay in her assigned area, without wandering off unless it is pertinent to her work; (c) plaintiff's conduct and behavior would be monitored closely for the next three months at which time a review would be done;  and (d) plaintiff would be oriented to CPR for use of certain equipment.  Id.

42. On February 28, 1994, a counseling session was held with plaintiff with Mr. Batten concerning plaintiff's lateness and absenteeism. See Exhibit "X."  As a corrective measure, plaintiff was to report to work on time and her lateness and absenteeism would be monitored for three months.  Plaintiff was required to bring in documentation for any sick day or unexcused absences. Id.

43. HHC Operating Procedure No. 20-2 addresses the issue of tardiness and advises that:

> [a]ll employees are obligated to report to work on time.  Employees are expected to be at their desks or work locations, in uniform (where applicable), ready for work promptly at the beginning of their scheduled tours.  Employees who are not at their work sites ready to work at the beginning of their scheduled tours are late.
>
> Any unauthorized absence that results in an employee's arrival at the desk or work location after the beginning of the schedule tour.  Each lateness, regardless of whether it is at the beginning  of the

scheduled work day or upon return from meal period is a separate unauthorized lateness.

<u>Excessive Tardiness</u>

Unexcused tardiness that results in an employee's late arrival on three (3) or more occasions in one month or in excess of 30 minutes in one month.

The Corporation reserves the right and power appropriately and for just cause to discipline or to discharge an employee for excessive lateness in accordance with established disciplinary procedures. <u>See</u> Exhibit "Y."

44. In March of 1996, plaintiff received an Action Plan For Improvement concerning her unsatisfactory performance in reporting to assigned area on time, staying in assigned area and interpersonal relationships with staff and patients. <u>See</u> Exhibit "Z." Plaintiff was to be monitored for time/work compliance and there was a change in plaintiff's time schedule to accommodate her needs. In three months plaintiff was to be re-evaluated.

45. Plaintiff was issued a Warning Notice on April 25, 1997, which noted:

Employee's persistent poor performance in the Emergency Department and continuous complaints from patients and co-workers about this employee's interaction and patient care interventions. The employee was counseled about these same issues in the past 4-6 months and has demonstrated no improvement. This situation represents unacceptable behavior and must be corrected. <u>See</u> Exhibit "AA."

46. In a Report of Warning Session dated, April 25, 1997, Constance Charles-GoBourne, Associate Director of Nursing, indicated that on April 25, 1997, a warning session was held with plaintiff concerning her poor performance and interaction with staff and patient's complaints regarding care received. <u>See</u> Exhibit "BB." It was also noted that "there was no agreement about corrective action because the employee did not

bring her written rebuttal to the meeting although the individual had ample time and opportunity to present the documents."

47. On April 30, 1999, plaintiff was given a counseling session concerning her unprofessional conduct on March 29, 1999. See Exhibit "CC." The corrective action was for plaintiff to be monitored and any unprofessionalism will be documented and result in a Warning being issued. Plaintiff verbally refused to attend the session.

48. In a Report of Counseling Session dated May 13, 1999, it was reported that on April 30 1999 a counseling session with plaintiff was held to discuss "unprofessional conduct on 3/29/99." Id. As a corrective measure plaintiff's conduct would be monitored and any unprofessionalism would be documented and result in a Warning being issued. It was noted that plaintiff refused to attend the session.

49. In a Action Plan For Improvement dated, September 7, 1999, by Head Nurse, Edythe Stoddard, regarding plaintiff's evaluation period of June 8, 1998 through June 8, 1999, plaintiff was noted as not having been satisfactory during this period due to plaintiff's poor interpersonal and communication skills with patients and staff. See Exhibit "DD." It was noted that plaintiff "refused to accept notice of counseling or to attend session" but would be re-evaluated in three months.

50. Plaintiff was out on a Worker's Compensation leave from December 6, 2002 through June 18, 2003. See Exhibit "EE" at p. 3.

51. In a Notice to Report, dated March 18, 2005, it was determined that plaintiff should be issued a Warning Notice for her refusal to sign in at a designated location and failure to make improvements in her work performance. See Exhibit "FF."

52. On March 24, 2005, plaintiff was issued an Employee Warning Notice by the Clinical Director of Nursing, June Bobcombe, concerning her unprofessional behavior. Specifically, the Warning Notice noted that plaintiff had been repeatedly advised that she must sign in and out in the designated location and that she must sign the time that she reports to work. See Exhibit "FF." The Warning Notice also noted that plaintiff had engaged in inappropriate behavior with the interdisciplinary team when she spoke to them in an "unprofessional and condescending manner in front of patients."

53. Finally, the March 24, 2005 Warning Notice noted that plaintiff had failed to provide patient care based on policy and as assigned/indicated by the Chief of the Rehabilitation Clinic. For example, plaintiff indicated in a medical record that a doctor had seen a patient when in fact the doctor had not. Id.

54. June Bobcombe, the Clinical Director of Nursing, testified that in an effort to improve plaintiff's performance, progressive discipline was utilized. Specifically, when plaintiff has failed to perform in a satisfactory manner she was spoken to then counseled, then warned and ultimately referred to human resources. See Exhibit "D" 46: at 5-15.

**D.    Numerous Complaints Were Submitted By Staff and Patients[3] About Plaintiff's Unprofessional And Inappropriate Behavior.**

55.      In a handwritten memorandum dated, January 30, 1994, Allison Skeete, CSW, a Social Worker from the Emergency Department, made a complaint against plaintiff. See Exhibit "GG." Ms. Skeete complained that on January 27, 1994, plaintiff was

> …very disruptive in her behavior towards patients
> in the E.D.  She was very argumentative with these

---

[3] Based on privacy considerations, the names and other identifying information of patients has been redacted on the written complaints attached as exhibits to the instant motion as well as in any reference to patient complaints made in the instant 56.1 Statement.

patients. This is not the first time I have observed this behavior. This was most upsetting because these patients are sick and come to us for treatment. This behavior should not happen with any professional; especially in the caring field such as nursing.

56.    In a memorandum dated, July 11, 1996, Dr. Toni Wright complained that on July 8, 1996, plaintiff refused to triage a trauma patient that was brought in by ambulance, claiming that "she had other things to do." See Exhibit "HH." When Dr. Wright approached her, plaintiff stated that "she did not need to be here and the patient would not speak to her." Additionally, however, plaintiff made no attempt to obtain urine from another patient, who had presented with blood in the urine, but documented in the triage sheet "unable to obtain urine." Dr. Wright reported that on prior occasions, plaintiff has lied concerning basic triage procedures, such as not doing pregnancy tests or failing to take temperatures on patients but nevertheless documenting results in the triage forms.

57.    In a handwritten letter dated August 5, 1996, Karuna Sharma, a Harlem Hospital Center employee who had been working in the Emergency Department, complained that on August 4, 1996, plaintiff failed to carry out certain orders concerning a patient and that plaintiff "shouted" at her and at a surgical resident. See Exhibit "II."

58.    Awilda Branchini, the Coordinating Manager for Payroll, complained that on November 12, 1996, she fell on the way to work, visited the emergency department and was seen by plaintiff. See Exhibit "JJ." Ms. Branchini complained that despite have a cut over her right eye, plaintiff never looked at the cut, nor did she attempt to clean her face in any way. Rather, plaintiff took her vitals and since they had met on a prior occasion, plaintiff began talking to Ms. Branchini about personal matters.

59.     On March 19, 1997 a patient in the hospital, with the initials D.L., complained that plaintiff was being "very rude to patients" and that despite the fact that the patient came in with chest pains, plaintiff told him that nothing was wrong with his heart and did not take his blood because she stated that he needed to relax.  See Exhibit "KK."  The patient also complained that plaintiff told another patient not to come back anymore.

60.     In a statement of complaint dated, March 29, 1997, C. R., a husband of a patient, complained that plaintiff called him a "Nigger" and "has been harassing" him during two visits he had at Harlem Hospital with his wife.  See Exhibit "LL."

61.     In a memorandum dated, April 22, 1997, Ms. Gwendolyn Knight, Supervisor, Department of Nursing, reported that on April 19, 1997, plaintiff was sent home because she refused an assignment.  See Exhibit "MM."  Specifically, plaintiff was scheduled to work overtime in the Adult Emergency Room, however, due to a staff shortage, she was re-assigned to Pediatric Emergency Room.  Plaintiff refused to go stating, "I don't work PER."

62.     In a memorandum dated, April 30, 1998, Susan Banks, the Associate Director of Medical Staff Affairs,  complained that she witnessed plaintiff "yelling at patients in the waiting room."  See Exhibit "NN."  Ms. Banks explained that plaintiff spoke to patients in tones that were "uncivil and discourteous" and a nurse commented that plaintiff has "always been disrespectful to the patients."

63.     Nurse Manager Edythe Stoddard advised that on June 8, 1998, plaintiff refused to add certain IV fluids as directed for one of her assigned patients.  See Exhibit "OO." When Nurse Manager Stoddard tried to explain that this is part of plaintiff's job duties, plaintiff stated that she "is not going to do it" and became loud and aggressive in her behavior.  Plaintiff was described as not being a team player, filled with anger, rude and unprofessional.  Ms.

Stoddard requested a meeting to discuss these issues and noted that plaintiff threatens to speak to Ms. Bobcombe and Ms. Scott, when approached.

64.      In a memorandum dated, June 23, 1998, Head Nurse Edythe Stoddard advised that plaintiff "is refusing to do her assignment."   See Exhibit "PP."    Ms. Stoddard recounted several infractions concerning plaintiff in 1998.  On one occasion, plaintiff refused to make a patient's bed stating, "let patient make it herself these patients know how to make beds." Another nurse had to make the bed.  When a patient requested ice, plaintiff refused to get the ice, stating that it was "not her problem" and that she "isn't a nurse's aide."  Plaintiff commented in front of a patient who was in restraints that this "is illegal" and again refused to make a patient's bed stating that she is "not a nurse's aide."  On another occasion, plaintiff refused to accompany a patient who was on a ventilator to another unit.  Also when a patient needed to be catheterized to collect urine, plaintiff refused to do it and challenged the doctor who wrote the order.

65.      In a handwritten letter, A.W., a patient, complained that on or about June 23, 1998, she asked plaintiff to change her bed sheets and plaintiff refused and was "nasty."  See Exhibit "QQ."   The patient reported that plaintiff said that she "isn't no Nurse Aid and that she has something better to do besides making patient's beds."

66.      In a handwritten memorandum from Head Nurse, Edythe Stoddard to June Bobcombe, the Clinical Director of Nursing, Ms. Stoddard indicated that on July 21, 1998, plaintiff refused to accept an assignment.  See Exhibit "RR."  Plaintiff was described as "very disruptive, "difficult to manage" and "constantly refusing to do what is asked of her."   Plaintiff was said to be "confrontational, abrupt and aggressive with staff, patients and physicians." "When approached she becomes defensive and negative."

67.     On July 31,1998, Head Nurse Stoddard complained that plaintiff is very disruptive and unprofessional." <u>See</u> Exhibit "SS."  When Ms. Stoddard asked to speak to plaintiff regarding her checklist, plaintiff initially refused stating tat she "will not speak with me unless it is in writing."  Ms. Stoddard requested a meeting to discuss the situation so that the situation could be addressed and resolved.

68.     On August 6, 1998, plaintiff refused an order from Head Nurse Stoddard to pick up doctors orders when plaintiff had not done morning care or made the beds for her patients and when Head Nurse Stoddard spoke to her about it, plaintiff commented in front of patients to "leave me alone or I'm going home," while shaking her finger in Ms. Stoddard's face and using an angry tone. <u>See</u> Exhibit "TT."

69.     On September 22, 1998, Charge Nurse Olivia Newson complained that plaintiff refused to admit patients, called her "Hitler" and was verbally abusive.  <u>See</u> Exhibit "UU."   Two patients complained that plaintiff had not made their beds in two days and one complained that plaintiff took a needle out of her arm and threw the needle and left it on the floor.

70.     Head Nurse Stoddard complained that on March 29, 1999, plaintiff approached her in a "menacing manner with her finger in my face," questioning her about her timesheet. <u>See</u> Exhibit "VV."  Ms. Stoddard alleged that plaintiff became "verbally abusive" using the word "damn" in her conversation.  Plaintiff's actions were found to be inappropriate and unprofessional and plaintiff was to be counseled concerning her unprofessional conduct.

71.     In a memorandum dated April 23, 1999, Head Nurse Stoddard complained that plaintiff refused to relieve another nurse as instructed. <u>See</u> Exhibit "WW."

72.     In a memorandum dated May 12, 1999, Associate Director, Pryce reported that May 5th, plaintiff stated that "she was not a maid" and refused to pick up linens and on the same day, a patient's home attendant spoke to her concerning plaintiff's behavior of shouting down the hall that she was :"not a maid" and being loud and unprofessional. See Exhibit "XX.' Plaintiff was said to continue to exhibit unprofessional conduct.

73.     In a memorandum dated February 7, 2000, from Head Nurse Arawole, it was reported that on two occasions plaintiff failed to accurately note her hours worked on her time sheet, putting earlier start times as compared to when she actually started work. See Exhibit "YY." When asked about it, plaintiff became "verbally abusive: to Head Nurse Arawole, calling her names and yelling at her in front of others. When she was caught falsifying time sheets in January, plaintiff refused to attend the scheduled counseling session. Plaintiff also leaves her post without permission and when asked about her behavior, plaintiff becomes "abusive" and loud in front of patients and doctors.

74.     In a memorandum dated February 14, 2000 from Assistant Head Nurse P. Cash-Smith, it was detailed that plaintiff was not working in her assigned area and when directed to report to her assigned area, plaintiff ignored the instructions and made a fifteen minute phone call. See Exhibit "ZZ." It was reported that plaintiff was consistently uncooperative and frequently absent form her assigned area.

75.     In a memorandum dated February 14, 2000 from Assistant Head Nurse P. Cash-Smith, it was detailed that plaintiff refused an assignment to escort a wheel chaired patient to the emergency room, in front of the patient. See Exhibit "AAA." Plaintiff then told that patient that she "might need you to write something for me later, I will get in touch with you later." When told to report for a meeting to discuss the incident, plaintiff refused .

76.     In a memorandum from Nurse, Annette Smith, dated February 28, 2000, it was reported that on February 25, 2000, plaintiff: failed to take vital signs for patients; had lengthy conversations, sitting in offices while others worked; left the unit several times without advising of her whereabouts; watched television. See Exhibit "BBB."

77.     In a memorandum dated February 29, 2000 from Assistant Head Nurse P. Cash-Smith, it was detailed that plaintiff refused to assess a patient as directed and in a 'loud threatening tone" stated that "I am not going to do it, go ahead and write me up, I'm not going in there until she (the patient) clams down." See Exhibit "CCC."  Plaintiff was said to exhibit "belligerent, unprofessional and uncaring behavior."   This incident was also reported by coordinating manager, Brenda McCoy. See Exhibit "DDD."

78.     In a memorandum dated March 16, 2000 from Assistant Head Nurse P. Cash-Smith, it was detailed that plaintiff, when asked not to remove her name from the auditing area, replied, "you are not my God, kiss my ass." And walked away. See Exhibit "EEE."

79.     In a memorandum dated March 21, 2000, from Assistant Head Nurse P. Cash-Smith, it was reported that plaintiff initially refused an  assignment to assist in the transportation of a patient to the emergency room.  See Exhibit "FFF."  When eventually following the instruction, plaintiff "fussed" and "argued" about the patient's condition and weight, stating that he patient should walk to the emergency room and asking the patient to get off the stretcher. This incident was also reported by Nurse Betty Everett. See Exhibit "GGG."

80.     In a handwritten memorandum from Nurse Manager Clara Fagbeyiro to the Clinical Director of Nursing, June Bobcombe dated, May 5, 2004, Nurse Manager Fagbeyiro reported that when she passed plaintiff and went into the nurse's station, plaintiff followed and

speaking loudly said "I don't care you can call Palmer or Bobcombe if you like etc.," in the presence of two patients and three nursing staff members. See Exhibit "HHH."

81.    In a letter to Dr. Herbert Thornhill, dated January 6, 2005, the Director of Rehabilitation Medicine from Miguelina Henriquez, a clerical associate, complained that plaintiff, "in an unprofessional and condescending manner," began to insult her and another employee in a tone loud enough for patients to hear. Plaintiff reportedly said that Ms. Henriquez and the other employee "work below the nurses and doctors and that in order to do a better job we needed an education." See Exhibit "III." Ms. Henriquez indicated that this was not the first time that plaintiff has yelled in a tone loud enough for patients to hear and noted that plaintiff created an unprofessional and hostile work environment.

82.    In a memorandum dated March 17, 2005, Nurse Manager Clara Fagbeyiro complained that despite her prior instructions, plaintiff failed to comply with Sign in and out policies of HHC. See Exhibit "JJJ." Nurse Manager Fagbeyiro, in a memorandum, dated April 4, 2005, indicated numerous instances in 2005 when plaintiff failed to follow sign in and out procedures by failing to note her arrival at work and merely placing an "X" in her arrival time, by arriving late or by not signing in at all. See Exhibit "KKK."

83.    Nurse Allison Benjamin complained to the police that on May 11, 2005, plaintiff threw a plate of food at her, has been verbally threatening to her and plaintiff stated to her that "I am going to get you bitch." See Exhibit "LLL."

84.    In a letter dated June 21, 2005, the Chief of Ambulatory Care, Dr. Lourdes Publico, reduced to writing conversations she had with Head Nurse Fagbeyiro concerning plaintiff. See Exhibit "MMM." In particular, plaintiff indicated something in a patient's record which did not occur, asked a patient to "shut up," refused to answer the

telephone when a hospital clerk was not in yet and was overheard talking to a patient about the clinic's staffing problems and airing personal complaints against colleagues.  Id.

85.     In a handwritten memorandum from Nurse Manager Clara Fagbeyiro, dated September 14, 2005, she noted that despite a posted and discussed policy against food in patient care areas, plaintiff had two boxes of cereal in such areas.  See Exhibit "NNN."  When asked about it by Nurse Manager Fagbeyiro, plaintiff screamed that she did not have time to take it to her locker and later called Nurse Manager Fagbeyiro a "liar" and said that "some people have evil face."

86.     In a handwritten memorandum from Nurse Manager Clara Fagbeyiro, dated September 21, 2005, it was noted that plaintiff argued with Ms. Fagbeyiro concerning why she had changed the staff assignments, told a patient what Nurse Manager Fagbeyiro had done and stated that she was ready for Nurse Manager Fagbeyiro and Ms. Bobcombe.  See Exhibit "OOO."  She questioned Nurse Manager Fagbeyiro concerning what kind of manager she was and followed her outside of her office to a patient area, shouting.  Plaintiff had to be stopped by Dr. Orville Palmer who indicated that plaintiff's unprofessional behavior would not be tolerated.

87.     In a memorandum from Clinical Director Bobcombe, dated February 10, 2006, to plaintiff, it was noted that despite prior requests to refrain from perusing papers on Ms. Bobcombe's secretary's desk, plaintiff was observed doing so on February 10, 2006.  When questioned about it, the memorandum stated that plaintiff became "obnoxious, loud and belligerent in front of staff."  See Exhibit "PPP."

88.     In a letter dated February 21, 2006 from Nurse Manager Fagbeyiro, it was reported that plaintiff refused to go to an assigned area questioned what kind of Head Nurse

and Manager Ms. Fagbeyiro was and followed Ms. Fagbeyiro around screaming at her.   See Exhibit "QQQ."

89.     In a memorandum from Nurse Manager Fagbeyiro dated March 15, 2006, plaintiff told Ms. Fagbeyiro to "shut up" and questioned what kind of manager she was. See Exhibit "RRR."  When plaintiff was seen coming out of the lounge when she reportedly was supposed to go to employee health, plaintiff told Ms. Fagbeyiro "shut up, I don't care what you all do, go to hell."

90.     In a handwritten note dated March 17, 2006, Ms. Bobcombe complained that when she was outside of the hospital with plaintiff, plaintiff said "bitch, you can't talk now. You think Harlem Hospital belong to you?  Where is your mother now Bobcombe?" See Exhibit "SSS."

91.     In a letter to the Personnel Director, Cheryl A. Merritt, dated March 30, 2006, Head Nurse Bobcombe described plaintiff's performance problems, misconduct and unprofessional behavior over an eight year period  from April 1998 though March 2006.  See Exhibit "TTT."  Specifically, the letter described plaintiff's lack of respect, verbal altercations, loud outbursts, insubordination, disruptive behavior, name calling, use of profanity, and falsification of time sheets by plaintiff.  The letter also described the most recent altercation when plaintiff started to pull time sheets from the nurse manager's hand and indicated that several Nurse Managers and at least three Chiefs of Service had requested that plaintiff be removed from their unit.

92.     From 1994 through 2006, plaintiff was the subject of various complaints by other nurses, patients, physicians, and other Harlem hospital staff member.  See Exhibit "UUU."  As indicated herein, these complaints concerned such things as plaintiff's misconduct,

unprofessional conduct, aggressive language and tone, rudeness, insubordination, failure to perform assigned nursing duties, failure to adhere to the hospital dress code and time and leave issues.

### E.   Plaintiff's History of Performance Problems, Misconduct And Unprofessional Behavior Resulted in Disciplinary Charges And Her Ultimate Termination.

93.     In an undated, handwritten note from Nurse Manager Fagbeyiro, it was noted that plaintiff fails to follow the uniform code and plaintiff stated that "it doesn't apply " to her. See Exhibit "VVV."

94.     Also in a memorandum to plaintiff dated, September 27, 2005, the Clinical Director of Nursing, June Bobcombe, discussed plaintiff's inappropriate behavior of not adhering to the uniform policy by appearing for work in a uniform that was not designated for her area and becoming indignant and refusing to cooperate with a survey conducted by JCACHO that was being done at the hospital. See Exhibit "WWW."

95.     In a memorandum from Nurse Manager Fagbeyiro, dated March 17, 2006, it was noted that for the recertification for the precision PCX glucometer, every nurse was expected to sign the attendance sheet and write the last six digits of their social security number on the sheet. See Exhibit "XXX."  In a memorandum from Nurse Manager Fagbeyiro dated March 15, 2006, it was noted that  all nurses in her area took the test on March 9, 2006 and returned the test on the very same day, except for plaintiff who kept her test until March 16 2006 and returned it only when Nurse Manager Fagbeyiro went to retrieve it from her.  Plaintiff also refused to note that last six digits of her social security number on the form.

96.     On March 20, 2006, Nurse Manager, Clara Fagbeyiro complained that since March 16, 2006 plaintiff had been out sick and they have not been able to enter the storage room in the Rehabilitation Clinic as plaintiff refused to place the storage room key in an agreed

upon area.  See Exhibit "YYY."    Nurse Manager Fagbeyiro stated that reminders to plaintiff were ignored and plaintiff's absence created difficulty getting needed supplies.

97.    On March 29, 2006, in a statement to the police, Nurse Manager, Clara Fagbeyiro noted that plaintiff came into Ms. Fagbeyiro's office and started looking though the time sheets of other staff, saying "stupid you, doing stupid job." The memorandum further stated that plaintiff said that she wanted to copy her time sheet and that Nurse Manager Fagbeyiro stated that she did not have a copy. Plaintiff then asked "why' and said that she was taking the time sheets.  See Exhibit "ZZZ."  Ms. Fagbeyiro picked up the sheets so that plaintiff could not take them and noted that plaintiff wanted to "take them from me."  Thereafter, Nurse Manager Fagbeyiro called the Hospital Police.  Id.   Both plaintiff and Ms. Fagbeyiro submitted written statements to the police.  Id.; see also Exhibit "ZZZ" and Exhibit "AAAA."

98.    In an e-mail to June Bobcombe, the Clinical Director of Nursing, Dr. Peter Flemister reported that on April 6, 2006, plaintiff told another employee to go elsewhere because she needed the computer.  See Exhibit "BBBB."  Dr. Flemister asked plaintiff to let the employee finish the documentation and that plaintiff could use the wireless computer.  Plaintiff came out of the nursing office to confront Dr. Flemister and was asked to leave the clinic by the doctor.  Plaintiff was described as having an inability to compromise and Dr. Flemister noted that during a staff meeting, plaintiff was extremely rude to her supervisor and he had to speak with her after the meeting concerning her inappropriateness.  Id.

99.    In a letter dated April 7, 2006 from Assistant Personnel Director, Beth Cooper, plaintiff was advised that due to the circumstances of April 6, 2006, involving the allegations of misconduct, plaintiff was relieved of duty without pay pending an investigation.

<u>See</u> Exhibit "CCCC." Plaintiff was suspended from April 7, 2006 though July 19, 2006. <u>See</u> Exhibit "T."

100.    In an Amended Notice and Statement of Charges dated, May 22, 2006, plaintiff was advised that disciplinary charges were preferred against her. <u>See</u> Exhibit "DDDD." Plaintiff was issued a total of five charges and fifteen specifications. The charges included the following: (1) plaintiff's falsification of timesheets from July 26, 2005 through March 24, 2006; (2) excessive lateness from July 26, 2005 to March 24, 2006, totaling approximately 1,581 minutes or 26.35 hours; (3) misconduct during incidents of February 21, 2006 and April 6, 2006: (4) insubordination on March 13, 2006, March 16, 2006 and April 6, 2006; and (5) insubordination in failing to adhere to the uniform/dress code. <u>Id.</u>; <u>see also</u> Exhibit "EEEE."

101.    The Clinical Director of Nursing, June Bobcombe testified that disciplinary charges were instituted against plaintiff for time and leave issues, inappropriate behavior and insubordination. <u>See</u> Exhibit "D" 43: at 1-6.

102.    On June 26, 2006, a Step IA disciplinary conference was held concerning the disciplinary charges that had been brought against plaintiff. <u>See</u> Exhibit "FFFF." Plaintiff was represented by her union and was allowed to present evidence on her own behalf. <u>See</u> Exhibit "B" 185: 23-25; 187: 13-15. Based on the evidence and statements offered at the hearing, plaintiff was found guilty and the Conference Officer recommended that plaintiff be separated from her employment. <u>Id.</u>

103.    On October 18, 2006, a Step II Informal Conference was held regarding the disciplinary Charges and Specification and the recommendation of termination by the Step IA Disciplinary Conference officer. <u>See</u> Exhibit "GGGG." Plaintiff was represented by her Union and was allowed to present evidence and witnesses on her own behalf. <u>Id.</u>

104.    The Review Officer, Alfred L. Dukes, Sr., noted that on June 26, 2006, a Step IA Disciplinary conference was held, sustaining the charges levied against plaintiff and recommended the penalty of termination of services.  "[P]articularly significant" was the Hospital Police reports detailing the actual arrival time of the grievant at the Harlem Hospital Center and the arrival entries made by plaintiff on her timesheets.  Plaintiff continued her misconduct by not arriving on time, having "poor" interactions and by failing to comply with dress and training.  Despite being given warnings, plaintiff's behavior failed to change. Id.

105.    The Review Officer, Alfred L. Dukes, Sr., carefully considered the presentations by both sides and the documents in support of the charges of misconduct.  The charges against plaintiff related to her falsification of her time records were found to be "quite significant and detail egregious, unacceptable and unprofessional behavior."  Id.  It was determined that "the preponderance of the documentation presented in this matter by the facility remains un-refuted by the grievant and her union representative and is adequate to justify the penalty recommendation of termination of her services as a Staff Nurse.  As such, the grievance on plaintiff's behalf was denied. Id.

106.    In correspondence dated January 2, 2007, plaintiff was advised that on December 7, 2006, Step II Hearing Officer Alfred Dukes Senior upheld the Step IA recommendation, dated September 5, 2006 to terminate her services as a Staff Nurse at Harlem Hospital. See Exhibit "HHHH."  Plaintiff's termination was effective January 2, 2007. Id.

F.    **Plaintiff's Retaliation Claims**

107.    Plaintiff testified that she believed that she was retaliated against for filing complaints of discrimination with the New York State Division Of Human Rights in 2003. Specifically, plaintiff claims that the alleged retaliatory acts were the following: she was terminated in 2003 while on Workers Compensation: and she was assigned to work in different

areas of the hospital: she was not given breaks: her time was not being credited properly; she was not given vacation time; she was not given proper amounts of supplies; she was not being given certain keys and that patients were allegedly told to hit her and tell her that she smells. See Exhibit "B" 143: at11-25; 144: at 1-7, 15; 145: at 20-22.

108.     Since approximately December 28, 2003 through 2006, plaintiff was assigned to the Rehabilitation Clinic. See Exhibit "Q," "R," "S," "T" and "U."

109.     Plaintiff testified in her deposition that she would be given lunch late and other times was told to put in for comp time if she did not get a lunch break. See Exhibit "B" 146: at10-13. Plaintiff claims that when she did put in for comp time, it would be "wiped out." See Exhibit "B" 146: at11-25.

110.     Plaintiff also testified that in 2004, she was not allowed to see a doctor, that on three occasions, her lock was cut two times from 1992 to 1998 and one time in 2006, although she did not know who cut her lock. See Exhibit "B" 146: at 23-23; 147: at 1-22. Plaintiff also alleged that when her father died in 1995, when her brother died in 1994 and when her mother died in 2000, she was denied time off by some unidentified individuals in the Nursing Department and once by the Clinical Director of Nursing, Ms. June Bobcombe. See Exhibit "B" 147: at 23-25: 148: at 1-11; 149: at 1-10. Plaintiff noted that she was eventually given time off for her mother's funeral. See Exhibit "B" 183: at 19-21. Plaintiff also complained that when she got sick at work around 1994, a doctor refused to see her and her family was thrown out by Hospital Police. See Exhibit "B" 149: at 11-25. Plaintiff testified that she was not given keys or additional supplies sometime between 2000 and 2002. See Exhibit "B" 150: at 6-14. 11-25. Plaintiff complained that in February 2006, Director Bobcome marked her absent from work

when she was not but acknowledged that she was paid for this time and was told that it was a mistake. <u>See</u> Exhibit "B" 153: at 17-22; 155: at 12-25.

111.    In her deposition, plaintiff testified that she could not state a basis for her belief that Clinical Director Bobcombe or Nurse Manager Fagbeyiro changed her timesheets. <u>See</u> Exhibit "B" 172: at 17-25. Plaintiff testified that it may have been personality and jealousy issues why Associate Director Bobcombe or Nurse Manager Fagbeyiro allegedly retaliated against her. <u>See</u> Exhibit "B" 173: at 7-23.

112.    Plaintiff claims that comments were made that Indians live in huts, eat cows, ask dowry's, sell their daughters, smell, are beggars, belong to the Taliban family and that she is from Punjab, the people with the turbans and is dangerous. <u>See</u> Exhibit "B" 135: at 12-17. Plaintiff claims that such comments were made by June Babcome, Edith Stoddard, Clara Fabeyiro, Pauline Blake, Mr. Glenn and others, the names of whom she could not recall. <u>See</u> Exhibit "B" 135: at 20-25.

113.    In letters dated June 20, 2005, November 10, 2005, March 27, 2006 and in an undated letter concerning the April 6, 2006 incident with Dr. Flemister, plaintiff made written complaints concerning her working conditions and claims of harassment and being "stressed out" by Nurse Manager, Clara Fagbeyiro. <u>See</u> Exhibit "IIII." Plaintiff did not assert that Nurse Manager Fagbeyiro discriminated against her at all, mush less based on plaintiff's national origin. <u>Id</u>.

## G.    Plaintiff Filed Two Administrative Charges of Discrimination.

114.    On January 14, 2003, plaintiff filed a Verified Complaint with the New York State Division of Human Rights alleging disability discrimination. On The New York State Division of Human Rights issued a Determination and Order After Investigation dated, July 28, 2005, in which it found "No Probable Cause" to establish that respondents had discriminated

against plaintiff. See Exhibit "JJJJ."    Thereafter, on November 2, 2005, the United States Equal Employment Opportunity Commission issued a Right to Sue letter. See Exhibit "KKKK."

115.    Plaintiff was terminated on May 13, 2003 while apparently on a Worker's Compensation leave and defendants' mistaken belief that she was Absent Without Leave ("AWOL"), due in part to plaintiff's failure to timely submit necessary documentation concerning this leave. Id.; see also Exhibit "EE," Exhibit "JJJJ" and Exhibit "LLLL."    On June 18, 2003, plaintiff was reinstated to work and received retroactive pay for the five-week period. Id.

116.    Plaintiff filed a Verified Complaint with the New York State Division of Human Rights, which was sworn to on May 8, 2006. See Exhibit "MMMM." Plaintiff alleged that Nurse Manager Clara Fagbeyiro and June Bobcombe, Clinical Director of Nursing, subjected her to disparate treatment because of plaintiff's age, race, national origin and based on a prior complaint she filed with the New York State Division of Human Rights.

117.    Plaintiff's corresponding Charge of Discrimination filed with The United States Equal Employment Opportunity Commission ("EEOC") alleged age, and national origin discrimination, as well as retaliation. See Exhibit "NNNN."

118.    HHC and Harlem Hospital submitted a Position Statement concerning plaintiff's complaint. See Exhibit "OOOO." In particular, plaintiff's history of poor performance and unprofessional conduct was noted and that plaintiff's lateness from August 2005 through March 2006 totaled approximately 1,581 minutes or 26.35 hours.  Concerning plaintiff's claims concerning being denied promotional opportunities, HHC records revealed that plaintiff applied for one Head Nurse position in February 2006.  Although plaintiff was

scheduled to be interviewed for the position, she cancelled and missed the interview on two separate occasions. See Exhibit "OOOO" at pg. 8; see also Exhibit "QQQQ."

119.    Following an investigation and opportunity for review of related information and evidence and in a Determination And Order after Investigation the SDHR found "no probable cause to believe that the respondent has engaged in or is engaging in the unlawful discriminatory practice complained of." See Exhibit "PPPP."

120.    In particular the investigation revealed that prior to the filing of plaintiff's complaint, plaintiff had a documented history and related disciplinary action for lateness and incidents of inappropriate conduct.   Specifically, in 2006, following additional incidents of inappropriate conduct by plaintiff, including non-physical altercations with a supervisor, plaintiff was suspended without pay. The SDHR found no evidence or examples of an employee of a different national origin, race and or age that plaintiff, having or being charged with having a similar disciplinary history. The employment actions were said to have been based on plaintiff's inappropriate behavior. The Determination and Order stated that the record did not support a nexus between the allegations of the instant complaint and the age, national origin and/or race of plaintiff, in that, plaintiff had been subjected to similar disciplinary action prior to the filing of her initial complaint. Accordingly, the SDHR dismissed plaintiff's complaint and closed the file.

121.    On March 29, 2007, the EEOC adopted the findings of the state agency that investigated the charge and mailed plaintiff a Right To Sue letter. See Exhibit "SSSS."

## H.    Plaintiff's Federal Lawsuit

122.    On or about July 7, 2007, plaintiff instituted the instant federal lawsuit. Plaintiff interposed an Amended Complaint dated, August 7, 2007.   See Exhibit "A."

123.    Plaintiff's Amended Complaint alleges that in or around the spring of 1998, a group of nurses of Caribbean descent began a pattern of discriminating against plaintiff by making offensive comments and false accusations of work misconduct.   See Exhibit "A" at ¶ 11.  Plaintiff claims that each employee who participated in the discrimination against plaintiff is of Caribbean or Nigerian descent and did not like plaintiff because of her national origin.  See Exhibit "A: at ¶ 12.

Dated: New York, New York
       August 27, 2009

                              MICHAEL A. CARDOZO
                              Corporation Counsel of the
                               City of New York
                              Attorney for Defendants
                              100 Church Street
                              New York, New York 10007
                              (212) 788-8685
                              cbarnett@law.nyc.gov

                        By: _____
                              Camille D. Barnett
                              Assistant Corporation Counsel